**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2007-WM2, by HSBC Bank USA, National Association, in its capacity as Trustee,<br><br>*Plaintiff*,<br><br>-against-<br><br>DB STRUCTURED PRODUCTS, INC.,<br><br>*Defendant*. | No. 13 Civ. 2053 (AJN)<br>**Oral Argument Requested** |
| ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2007-HE4, by HSBC Bank USA, National Association, in its capacity as Trustee,<br><br>*Plaintiff*,<br><br>-against-<br><br>DB STRUCTURED PRODUCTS, INC.,<br><br>*Defendant*. | No. 13 Civ. 2828 (AJN)<br>**Oral Argument Requested** |
| ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2007-HE5, by HSBC Bank USA, National Association, in its capacity as Trustee,<br><br>*Plaintiff*,<br><br>-against-<br><br>DB STRUCTURED PRODUCTS, INC.,<br><br>*Defendant*. | No. 13 Civ. 3687 (AJN)<br>**Oral Argument Requested** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
DB STRUCTURED PRODUCTS INC.'S MOTION TO DISMISS THE COMPLAINTS**

SIMPSON THACHER & BARTLETT LLP

425 Lexington Avenue
New York, NY 10017
Tel.:  (212) 455-2000
Fax:  (212) 455-2502

*Attorneys for Defendant DB Structured
Products, Inc.*

September 27, 2013

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ............................................................................................... 7

ARGUMENT .................................................................................................... 8

I.    THE PSAS' SOLE REMEDY PROVISIONS BAR CLAIMS FOR DAMAGES ............ 8

    A.    The Loan-By-Loan Repurchase Protocol Is Plaintiff's Sole Remedy ................... 8

    B.    DBSP Cannot "Separately Breach" Its "Cure And Repurchase Obligations" ......................................................................................... 10

    C.    Plaintiff's Other Arguments Against The Sole Remedy Provision Fail ............... 12

    D.    Plaintiff Is Not Entitled To Rescissory Damages .................................... 14

II.   PLAINTIFF'S "DISCOVERY" ALLEGATIONS FAIL ................................. 17

III.  PLAINTIFF'S SPECIFIC PERFORMANCE CLAIMS MUST BE DISMISSED ........ 21

    A.    The Breach Notices Sent To DBSP Were Inadequate ........................... 22

    B.    Plaintiff Fails To Plead Claims Concerning Loans Subject To Repurchase ........ 23

    C.    The Contrary Reasoning Of *ACE Securities* and *DBALT* Should Be Rejected ............................................................................................ 28

IV.   PLAINTIFF'S DECLARATORY JUDGMENT CLAIMS MUST BE DISMISSED ........................................................................................ 30

CONCLUSION .................................................................................................. 31

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Abele Tractor & Equip. Co., Inc. v. Varity Corp.*,
  977 F. Supp. 1252 (N.D.N.Y. 1997) ................................................................. 15

*ACE Securities Corp. v. DB Structured Products, Inc.*,
  965 N.Y.S.2d 844 (Sup. Ct. N.Y. Cty. 2013) ................................................. 1, 12

*Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*,
  869 F.2d 1518 (D.C. Cir. 1989) ........................................................................ 23

*Amsterdam Sav. Bank v. Marine Midland Bank*,
  121 A.D.2d 815 (3d Dep't 1986) ...................................................................... 13

*Andersen v. Andersen*,
  69 A.D.3d 773 (2d Dep't 2010) ........................................................................ 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................... 20

*Assured Guar. Corp. v. EMC Mortg., LLC*,
  39 Misc.3d 1207(A) (Sup. Ct. N.Y. Cty. Apr. 4, 2013) ................................. 15, 16

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
  2011 WL 5335566 (S.D.N.Y. Oct. 31, 2011) ................................................... 11

*Atl. Richfield Co. v. Interstate Oil Transp. Co.*,
  784 F.2d 106 (2d Cir. 1986) ............................................................................. 22

*Banus v. Citigroup Global Markets, Inc.*,
  2010 WL 1643780 (S.D.N.Y. Apr. 23, 2010) ................................................... 15

*CBS Inc. v. Ziff-Davis Pub. Co.*,
  75 N.Y.2d 496 (1990) ....................................................................................... 22

*Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*,
  2012 WL 3201139 (Del. Ch. Aug. 7, 2012) ..................................................... 21

*Centennial Ins. Co. v. Gen. Elec. Co.*,
  253 N.W.2d 696 (Mich. App. 1977) ................................................................. 11

*Chechele v. Morgan Stanley*,
  2012 WL 4490730 (S.D.N.Y. Sept. 26, 2012) ................................................. 21

*Consarc Corp. v. Marine Midland Bank, N.A.*,
  996 F.2d 568 (2d Cir. 1993) ............................................................................. 28

*Cont'l Cas. Co. v. Stronghold Ins. Co., Ltd.*,
   77 F.3d 16 (2d Cir. 1996) ............................................................................... 12

*Doyle v. Allstate Ins. Co.*,
   1 N.Y.2d 439 (N.Y. 1956) ............................................................................... 14

*Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionery Workers Int'l, AFL-CIO*,
   370 U.S. 254 (1962) ....................................................................................... 23

*EMI Realty Corp. v. 241-247 Hempstead Tpk., Inc.*,
   26 A.D.3d 406 (2d Dep't 2006) ....................................................................... 15

*First Place Bank v. Skyline Funding, Inc.*,
   2011 WL 3273071 (N.D. Ill. July 27, 2011) .............................................. 25, 26

*First Place Bank v. Skyline Funding, Inc.*,
    2011 WL 824612 (N.D. Ill. Mar. 4, 2011) ..................................................... 24

*Flanagan v. Prudential-Bache Sec., Inc.*,
   67 N.Y.2d 500 (N.Y. 1986) ............................................................................. 11

*Franklin Am. Mortg. Corp. v. First Educators Credit Union*,
   2013 WL 1785498 (M.D. Tenn. Apr. 25, 2013) ............................................. 25

*Goodman v. Port Auth. of N.Y. & N.J.*,
   2011 WL 3423800 (S.D.N.Y. Aug. 4, 2011) ................................................... 20

*Greenfield v. Philles Records, Inc.*,
   98 N.Y.2d 562 (N.Y. 2002) ............................................................................... 9

*Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*,
   18 N.Y.3d 765 (N.Y. 2012) ............................................................................. 12

*Home Equity Mortgage Trust Series 2006-5 v. DLJ Mortg. Capital, Inc.*,
   Index No. 653787/2012 (N.Y. Sup. Ct., N.Y. Cty. Sept. 18, 2013)
   ("*HEMT*") .............................................................................................. 10, 17

*Huffington v. T.C. Grp., LLC*,
   637 F.3d 18 (1st Cir. 2011) ............................................................................. 11

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   886 F. Supp. 2d 340 (S.D.N.Y. Aug. 13, 2012) .............................................. 20

*John Doris, Inc. v. Solomon R. Guggenheim Found.*,
   209 A.D.2d 380 (2d Dep't 1994) ..................................................................... 28

*LaSalle Bank, N.A. v. Lehman Bros. Holdings, Inc.*,
   237 F. Supp. 2d 618 (D. Md. 2002) ................................................................ 12

*Lehman Bros. Holdings, Inc. v. Key Fin. Corp.*,
  2011 WL 1296731 ............................................................................................. 25

*Maniolos v. U.S.*,
  741 F. Supp. 2d 555 (S.D.N.Y. 2010) ................................................................ 8

*MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*,
  2012 WL 4511065 (D. Minn. Oct. 1, 2012) ............................................ 23, 25, 26

*MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*,
  843 F. Supp. 2d 996 (D. Minn. 2012) ........................................................... 10, 22

*MBIA Ins. Co. v. Residential Funding Co., LLC*,
  2009 WL 5178337 (Sup. Ct. N.Y. Cty. Dec. 22, 2009) ...................................... 14

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
  105 A.D.3d 412 (1st Dep't 2013) ................................................................ 14, 15

*Meltzer v. G.B.G., Inc.*,
  176 A.D.2d 687 (1st Dep't 1991) ...................................................................... 23

*Menard v. CSX Transp., Inc.*,
  698 F.3d 40 (1st Cir. 2012) ............................................................................... 20

*Met. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
  84 N.Y.2d 430 (N.Y. 1994) ............................................................................ 9, 16

*Milligan v. Shuly's Wigs, Inc.*,
  2011 WL 6440904 (N.Y. App. Term Dec. 19, 2011) .......................................... 14

*Mom's Bagels of N.Y. v. Sig Greenebaum, Inc.*,
  164 A.D.2d 820 (1st Dep't 1990) ........................................................................ 9

*Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg.
  Capital Holdings LLC*, Index No. 652763/2012 (N.Y. Sup. Ct., N.Y.
  Cty. Aug. 21, 2013) ......................................................................................... 17

*Nationwide Advantage Mortg. Co. v. Mortg. Servs. III, LLC*,
  2013 WL 1787551 (N.D. Ill. Apr. 25, 2013) ............................................... 24, 25

*New Paradigm Software Corp. v. New Era of Networks, Inc.*,
  107 F. Supp. 2d 325 (S.D.N.Y. 2000) ............................................................... 16

*New Shows, S.A. de C.V. v. Don King Prods., Inc.*,
  210 F.3d 355, 2000 WL 354214 (2d Cir. Apr. 6, 2000) ..................................... 16

*Nomura Asset Acc. Corp. Series 2005-S4 v. Nomura Credit & Capital,
  Inc.*,
  2013 WL 2072817 (Sup. Ct. N.Y. Cty. May 10, 2013) ................................. 11, 12

*Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*,
    2010 WL 1257326 (S.D.N.Y. Mar. 12, 2010) ...................................................................... 30

*Resolution Trust Corp. v. Key Fin. Servs., Inc.*
    280 F.3d 12 (1st Cir. 2002) ...................................................................... 12

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ...................................................................... 15

*Rudman v. Cowles Commc'ns, Inc.*,
    30 N.Y.2d 1 (N.Y. 1972) ...................................................................... 16

*Sterling Fed. Bank, F.S.B. v. Credit Suisse First Boston Corp.*,
    2008 WL 4924926 (N.D. Ill. Nov. 14, 2008) ...................................................................... 11

*Trust For Certificate Holders of MLMI 1999-C1 v. Love Funding Corp.*,
    2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005) ...................................................................... 26

*Tsereteli v. RAST 2006-A8*,
    692 F. Supp. 2d 387 (S.D.N.Y. 2010) ...................................................................... 19

*U.S. Bank, N.A. v. Greenpoint Mortg. Funding, Inc.*,
    2010 WL 841367 (Sup. Ct. N.Y. Cty. Mar. 3, 2010). ...................................................................... 16

*Walnut Place LLC v Countrywide Home Loans, Inc.*,
    96 A.D.3d 684 (1st Dep't 2012) ...................................................................... 11

*Watson v. Riptide Worldwide, Inc.*,
    2013 WL 417372 (S.D.N.Y. Feb. 4, 2013) ...................................................................... 15

**Statutes and Rules**

26 U.S.C. § 860 ...................................................................... 7, 22

N.Y. STAT. L. § 301 ...................................................................... 12

**Other Authorities**

Black's Law Dictionary (9th ed. 2009) ...................................................................... 22

Eddy, *On the 'Essential Purposes' of Limited Remedies: The Metaphysics*
    *of UCC Section 2-719(2)*, 65 CAL. L. REV. 28, 30 (1977) ...................................................................... 12

REST. 2D CONTRACTS § 250 ...................................................................... 19

DB Structured Products, Inc. respectfully submits this memorandum of law, together with the Declaration of David J. Woll and its annexed exhibits, in support of its Motion to Dismiss.[1] Pursuant to the Stipulation and Order Concerning Coordination and Briefing Schedules, which this Court so-ordered on September 10, 2013, the parties have agreed to brief jointly the motions to dismiss in each of the above-captioned actions.

## PRELIMINARY STATEMENT

Each of these actions was commenced nearly six years after the transactions at issue closed, at the direction of Amherst Advisory & Management LLC ("Amherst"), a "distressed debt" investment fund that purchased residential mortgage-backed security ("RMBS") certificates well after the collapse of the real estate market.[2]  Like many such funds, Amherst is pursuing an investment strategy of buying RMBS in the secondary market at deep discounts in order to pursue claims for breaches of representations and warranties ("RWs") concerning loans underlying the RMBS.[3]  HSBC Bank USA, N.A. ("HSBC"), as the Trustee of the three Trusts that issued the RMBS that Amherst eventually purchased, filed these cookie-cutter actions at Amherst's instruction.  For the reasons discussed below, the Complaints should be dismissed.[4]

These actions arise out of agreements (the "Agreements") executed in connection with

---

[1] The exhibits are cited herein as "Ex. __."  The complaints are cited herein as " WM2 Compl. ¶ __", "HE4 Compl. ¶ __", and "HE5 Compl. ¶ __".  Except as otherwise noted, all emphases are added and internal citations and quotation marks are omitted herein.

[2] Though the Complaints do not identify the unnamed "Certificateholder" who directed the forensic review of the loans underlying each Trust, the pre-litigation correspondence identifies Amherst as the relevant party.  *See, e.g.*, Exs. 7, 8, 10, 13, 14, 15, 18, 20, 21.

[3] *See* Asset Backed Alert, *MBS 'Putback' Investors Target Big Issuers* (Feb. 24, 2012), *available at* http://www.abalert.com/headlines.php?hid=156068 ("A growing number of hedge funds are scouring the files of securitized home loans, in hopes of reaping rich profits by forcing mortgage-bond issuers to buy back faulty credits.  Monarch Alternative Capital was among the first to begin carrying out the "putback" strategy last year.  Now, Amherst Advisory & Management, Fir Tree Partners, Glenview Capital and Varde Partners are among other fund managers working either on their own or in teams to follow the same course.").

[4] These actions are three of numerous similar cases pending between the parties.  As discussed *infra*, rulings on motions to dismiss brought by DBSP have been issued in two such actions.  *See Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Struct. Prods., Inc.*, 2013 WL 3863861 (S.D.N.Y. July 24, 2013) ("*DBALT*"); *ACE Securities Corp. v. DB Struct. Prods., Inc.*, 965 N.Y.S.2d 844 (Sup. Ct. N.Y. Cty. 2013) ("*ACE Securities*").

the formation of three trusts and their issuance of RMBS: ACE Securities Corp. ("ACE") Home Equity Loan Trust 2007-WM2 (the "WM2 Trust"), ACE Home Equity Loan Trust 2007-HE4 (the "HE4 Trust"), and ACE Home Equity Loan Trust 2007-HE5 (the "HE5 Trust"; collectively, the "Trusts").   DB Structured Products, Inc. ("DBSP") purchased loans from mortgage originators.   DBSP then transferred a pool of these loans to ACE Securities Corp. ("ACE"), a securitization conduit known as a "depositor," pursuant to a Mortgage Loan Purchase Agreement (the "MLPA") which contains RWs concerning the loans.  *See, e.g.*, ACE 2007-HE4 MLPA § 6 (Ex. 4).   Next, the loans, and ACE's rights under the MLPA, were transferred "to the Trustee, on behalf of the Trust" pursuant to the Trust's governing contract, a Pooling and Servicing Agreement (the "PSA").[5]  *See, e.g.*, ACE 2007-HE4 PSA § 2.01 (Ex. 3).[6]  The Trust then issued certificates which entitle investors to shares of payments made on the underlying loans.

Under the PSA for each Trust, the Trustee has the ability to request, in accordance with procedures set forth in Section 2.03 (the "Repurchase Protocol"), that DBSP repurchase a loan that breaches the RWs made in the related MLPA.  The Repurchase Protocol provides:

- "Upon discovery or receipt of notice … of a breach by [DBSP] of any [RW] in respect of any Mortgage Loan that materially and adversely affects the value of such Mortgage Loan, or the interest therein of the Certificateholders, ***the Trustee shall promptly notify [DBSP] of such … breach*** and request that [DBSP] … cure such … breach within 60 days from the date [DBSP] was notified of such … breach."

- "If [DBSP] does not … cure such … breach in all material respects during such period, the Trustee shall enforce the obligations of [DBSP] under the [MLPA] ***to repurchase such Mortgage Loan from REMIC I at the Purchase Price*** within 90 days after the date on which [DBSP] was notified of such … breach."

---

[5] The parties to the PSAs for all three Trusts are ACE, as Depositor; HSBC, as Trustee; and Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator.  ACE's role is largely limited to transferring the loans to the Trust.  HSBC, as Trustee, takes action on behalf of the Trust.  The Master Servicer oversees the servicing of the mortgage loans and aggregates monthly servicing reports and remittances.  The Securities Administrator distributes payments to the Certificateholders, monitors the performance of the securitization, and distributes monthly reports to investors.  The MLPAs and PSAs are governed by New York law.  *See* PSA § 12.04; MLPA § 17.

[6] The MLPAs and PSAs executed in connection with each Trust are substantially similar in all material respects and are attached as Exhibits 1-6 to the Woll Declaration.  For ease of reference, all citations herein to the MLPA and PSA refer to the MLPA and PSA executed in connection with the HE4 Trust unless otherwise indicated.

- "It is understood and agreed that the obligation of [DBSP] to cure or to repurchase (or to substitute for) any Mortgage Loan as to which … such a breach has occurred and is continuing **shall constitute the sole remedy respecting such … breach** available to the Trustee and the Certificateholders."

In the Complaints, Plaintiff asserts, in the face of the clear and unambiguous terms of the PSAs' Repurchase Protocol, that (1) it can sue for RW breaches without providing any prior notice, much less prompt notice of such breaches (*e.g.*, WM2 Compl. ¶ 68; HE4 Compl. ¶ 69; HE5 Compl. ¶ 69); (2) it can obtain "rescissory" and other measures of damages despite the PSAs' express limitation of its remedies (*e.g.*, WM2 Compl. ¶ 124; HE4 Compl. ¶ 126; HE5 Compl. ¶ 126); and (3) it is entitled to "make whole" payments for loans despite the PSAs' specification that its sole remedy is "repurchase … at the Purchase Price" (*e.g.*, WM2 Compl. ¶ 86; HE4 Compl. ¶ 87; HE Compl. ¶ 87).  The Complaints present an incomplete and misleading depiction of investors' rights and remedies in the hope of convincing this Court that enforcing the Agreements in accordance with their terms would be inequitable.  New York law is clear, however, that sophisticated parties may agree to limitations on liability and that these limitations will be enforced despite a party's subsequent dissatisfaction.  Moreover, there is no inequity.  The certificates offered by the Trusts were also registered with the U.S. Securities and Exchange Commission (SEC) and offered through prospectuses which contained extensive descriptions of the characteristics of the underlying mortgage loans.  Like investors in other publicly-offered securities, investors who believe that the RMBS they purchased are other than as represented have recourse not only to the expressly prescribed and limited sole remedy of repurchase set forth in the PSAs, but to the extensive rights and remedies created under the securities laws.  These cases, however, are limited to the contractual rights and remedies set forth in the operative Agreements, which were publicly available on the SEC's website since the transactions' respective inceptions.  Plaintiff is entitled to enforcement of the Agreements as written; it is not

entitled to have them rewritten in its favor simply because it now deems their terms unjust.

**Plaintiff's "Damages" Claims (Counts I and II of Each Complaint) are Barred by the PSAs' Sole Remedy Provision**.  The PSAs clearly provide that the loan-by-loan Repurchase Protocol "shall constitute the sole remedy respecting … [a RW] breach available to the Trustee and the Certificateholders."  PSA § 2.03(a).  "Sole remedy" provisions are enforceable under New York law and have been repeatedly upheld by the courts of this and other states.  The Complaints attempt an end-run around these express contractual provisions by claiming entitlement to general contract and rescissory damages under a host of flawed legal theories.  Plaintiff alleges that the RWs were fundamental to the transactions at issue, but, recognizing that the Agreements only provide limited remedies for RW breaches, asserts that only a "handful of [RW breaches] might have come within the parties' expectations," and argues that because the Complaints ostensibly allege more than a "handful" of breaches, the contractually-specified repurchase remedy is "impractical" and should be jettisoned in favor of Plaintiff's now-preferred remedies.  WM Compl. ¶ 17; HE4 Compl. ¶ 18; HE5 Compl. ¶ 18.  This makes no sense.  The risk of RW breaches was clearly within the contemplation of the parties and expressly allocated through the RWs (which protect Plaintiff) *and* the express limitations on Plaintiff's remedies for breaches (which protect DBSP).  There is no support in the Agreements or the Complaints for the implausible allegation that only a "handful" of breaches were contemplated.

**The Complaints Fail to Allege the Essential Elements for Specific Performance (Count III of Each Complaint)**.  Plaintiff's own failure to comply with the terms of the Agreements bars its specific performance claims.  The Trustee did not comply with the pre-suit notice provisions of the Repurchase Protocol before commencing any of these actions and its assertion that it should be excused from doing so are not supported by the Agreements or any

well-pleaded allegations. Plaintiff's bare-boned allegation that DBSP's own "discovery" of the alleged RW breaches triggered an obligation to repurchase loans without Plaintiff having to provide any notice is based on nothing more than "information and belief" that DBSP is affiliated with certain mortgage originators whose loans were placed in the Trusts and that DBSP, like every other RMBS sponsor, performed due diligence on the loans prior to securitization.  Yet, the Complaints allege that whatever RW breaches may have occurred were the result of "outright misrepresentations or material omissions by the borrower," not by any DBSP affiliate (*see, e.g.*, WM2 Compl. ¶ 50; HE4 Compl. ¶ 52; HE5 Compl. ¶ 52) and Plaintiff does not, nor can it allege that any DBSP affiliate knew of such borrower misrepresentations or communicated them to DBSP.  Further, Plaintiff's allegation that DBSP ***must have*** discovered the alleged RW breaches because it was industry practice to perform diligence prior to securitization is entirely conclusory and is the same nonspecific allegation Plaintiff has made in several cases against other RMBS sponsors. *See, e.g.*, *HSBC Bank USA, N.A. v. Nomura Credit & Capital, Inc.*, Index No. 650337/2013, Compl. ¶ 3 ("On information and belief, Nomura performed due diligence on the Mortgage Loans before acquiring them … and had discovered … that a material number of the Mortgage Loans failed to satisfy its representations and warranties.") (filed Jan. 30, 2013) (Ex. 29).  If Plaintiff were correct that these allegations were sufficient, the notice provisions of the Agreements would be superfluous since a trustee could always avoid them by pointing to industry practice of performing due diligence and speculating that this diligence had to have uncovered RW breaches.  Obviously, this is not what the parties contemplated and more is required for Plaintiff to avoid the contracts' pre-suit notice terms.

The Complaints also fail to allege that any alleged breaches pertained to Mortgage Loans that are assets of the Trusts.  The Agreements clearly limit any repurchase obligation to

Mortgage Loans that are Trust assets and do not require DBSP to issue "make-whole" payments or otherwise reimburse the Trusts for losses incurred in connection with loans that have been repaid or otherwise liquidated and, thus, no longer capable of being repurchased.  Nonetheless, Plaintiff tries to elide the contracts' unambiguous terms by not alleging which, if any, of its breach claims pertain to Mortgage Loans that are still property of the relevant Trusts—information that is clearly available to Plaintiff as Trustee—and by instead resorting to extraneous and irrelevant allegations concerning a so-called "custom and practice" by DBSP of providing "make whole" or reimbursement payments that the contracts do not require.  Plaintiff's failure to identify whether its breach claims pertain to Mortgage Loans that are still Trust assets, combined with the unambiguous terms of the operative agreements, warrants dismissal.  Even if the Court determines, however, that this issue raises factual questions that cannot be resolved on this motion, it should not adopt Plaintiff's counter-textual interpretation of the contracts, which is based on allegations of extrinsic "evidence" offered for the improper purpose of altering the terms of the parties' agreements.

**The Complaints Fail to Allege Entitlement to Declaratory Judgment (Count IV of Each Complaint)**.  Finally, Plaintiff is not entitled to a declaration that DBSP is obligated to reimburse Plaintiff for all "expenses reasonably incurred in connection with enforcing the remedies" for RW breaches.  *See, e.g.*, WM2 Compl. ¶ 137; HE4 Compl. ¶ 139; HE5 Compl. ¶ 139.  New York law is clear that a claim seeking a declaration of the parties' rights and obligations under an agreement must fail where, as here, a plaintiff "invokes its right to a coercive remedy" by bringing breach of contract claims and seeking damages and specific performance, and courts have rejected nearly identical declaratory judgment claims brought by RMBS trustees against securitization sponsors.  For the same reasons, those claims also fail here.

## **BACKGROUND**

Well over five years after the Trusts' respective closing dates, the Trustee forwarded to DBSP letters from Amherst purporting to allege certain RW breaches.  Specifically:

- with respect to the WM2 Trust, on July 17, 2012, September 4, 2012 and March 12, 2013, Plaintiff forwarded to DBSP letters it had received from Amherst alleging RW breaches in a combined 1,254 loans;

- with respect to the HE4 Trust, on September 19, 2012, November 19, 2012, December 4, 2012 and March 12, 2013, Plaintiff forwarded to DBSP similar letters it received from Amherst alleging RW breaches in a combined 1,379 loans; and

- with respect to the HE5 Trust, on September 5, 2012 and March 12, 2013, Plaintiff forwarded to DBSP letters it received from Amherst alleging RW breaches in a combined 395 loans.[7]

The Trustee's cover letters to DBSP each stated that it "has not conducted any independent review of the facts asserted [in Amherst's letters] and makes no representations as to the accuracy of the information contained therein."  *See, e.g.*, Exs. 7, 8, 10, 13, 14, 15, 18, 20, 21.

DBSP responded to these letters through various letters of its own beginning in late 2012. *See* Exs. 9, 11, 12, 16, 17, 19, 22, 23.  Each letter explained that because DBSP was only required to repurchase loans that actually, materially and adversely breach RWs, DBSP had to review the allegations and the underlying loan origination and servicing files before repurchasing any loans.  *E.g.*, Ex. 23 at 1.  DBSP further explained that because Amherst's letters did not adequately provide these materials, DBSP had requested them from the Servicer, and also requested that the Trustee provide DBSP with any such materials available to it.  *E.g.*, *id.* at 1-2.

Instead of supplying the requested materials, the Trustee filed these suits on March 27, 2013 (WM2), April 29, 2013 (HE4) and May 31, 2013 (HE5), reversing course on its prior

---

[7] Exs. 7-12 contain the breach letters and DBSP's responses thereto in connection with the WM2 Trust; Exs. 13-19 contain the HE4 Trust breach letters and responses thereto, and Exs. 20-23 contain the HE5 Trust breach letters and responses thereto.

disclaimers, accusing DBSP of "repudiat[ing] and abandon[ing] its obligations," and even going so far as to allege that it would be futile "to await expiration of the [60-day] cure or [90-day] repurchase periods provided for in the parties' agreements before asserting claims" on the loans identified in the March 12, 2013 letters it sent to DBSP in connection with each Trust.  WM2 Compl. ¶83; HE4 Compl. ¶ 84; HE5 Compl. ¶ 84.

## ARGUMENT

A motion to dismiss brought under Rule 12(b)(6) will be granted if the complaint fails to assert a legally cognizable claim and to allege facts that, if true, would support such a claim.  A court "may dismiss a complaint based on a contract if the contract unambiguously shows that the plaintiff is not entitled to the requested relief."  *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 315 (S.D.N.Y. 2002).  "Legal conclusions, deductions or opinions couched as factual allegations" are not accepted as true, *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007), nor should a court "accept the allegations of the complaint as to how to construe" the terms of the contract at issue.  *Maniolos v. U.S.*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010).

## I.     THE PSAS' SOLE REMEDY PROVISIONS BAR CLAIMS FOR DAMAGES

Each Complaint purports to assert two causes of action for monetary damages: Count I for "Breach of Contract/Damages" and Count II for "Fundamental Breach/Rescissory Damages." The MLPAs and PSAs for the relevant Trusts, however, clearly provide that Plaintiff's ***sole remedy*** for RW breaches is repurchase of the allegedly breaching mortgage loans at the "Purchase Price" assuming the loans have not been repaid or liquidated and are still Trust assets. New York law is clear that such "sole remedy" provisions are valid limitations on liability that must be honored and enforced.  Accordingly, Plaintiff's damages claims must be dismissed.

### A.     The Loan-By-Loan Repurchase Protocol Is Plaintiff's Sole Remedy

The MLPAs and PSAs are clear and unambiguous and therefore "must be enforced

according to the plain meaning of [their] terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002). They specify that the Repurchase Protocol "constitute[s] the sole remedy respecting" RW breaches, and expressly state that the parties "understood and agreed" that no other form of relief would be available. PSA § 2.03(a); MLPA § 7(c). Pursuant to the Repurchase Protocol, if a material breach cannot be cured, the PSA requires DBSP to repurchase the loan "at the Purchase Price" within 90 days of receiving an effective RW breach notice. PSA § 2.03(a). This is the sole remedy contemplated by the Agreements—and the tax code.[8] Plaintiff therefore cannot obtain other forms of relief, such as general contract or rescissory damages.[9] As the New York Court of Appeals has explained "[a] limitation on liability provision in a contract represents the parties' agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor," and that while the parties "may later regret their assumption of the risks of non-performance in this manner[, ] the courts let them lie on the bed they made." *Met. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (N.Y. 1994); *see also Mom's Bagels of N.Y. v. Sig Greenebaum, Inc.*, 164 A.D.2d 820, 822 (1st Dep't 1990) (courts "have long held that parties … may agree to limit the seller's liability for damages.").

---

[8] The loan-by-loan repurchase remedy is not only a negotiated limit on DBSP's liability, but also serves an important tax compliance function. The Trust's treatment as a Real Estate Mortgage Investment Conduit ("REMIC") is centrally important to investors, because as a REMIC, the Trust is a "pass through" vehicle exempt from corporate tax. *See* PSA, Prelim. Stmt.; *id.*, Art. XI; *see also* 26 U.S.C. §§ 860A-860G. REMICs may only hold mortgage loans, income received on such loans, and properties acquired via foreclosure on such loans. *See* 26 U.S.C. § 860G(a). Income that does not derive from specific loans or related assets is subject to 100% tax, and if more than a *de minimis* amount of such prohibited income is received, REMIC status may be revoked. *Id.* §§ 860D(b)(2)(A), 860F(a), 860G(d). Enforcement of the sole repurchase remedy in accordance with its terms is thus the only result consistent with the parties' clear intention to preserve the Trust's REMIC status and avoid receipt of prohibited income. *See, e.g.*, PSA, § 11.01(f) (Parties to the PSA "shall not take any action" that could "endanger the status of each Trust REMIC as a REMIC or … result in the imposition of a tax upon the Trust Fund.").

[9] As discussed in detail in Section II.C below, the contractual "Purchase Price" for a defaulted loan that was liquidated at a loss "shall be zero." This is clearly dictated by the unambiguous language of the PSAs. The important limitation on recoveries embodied by this provision would be entirely nullified if Plaintiff could pursue claims for damages for breach of loan-level RWs outside the Repurchase Protocol.

Here, as numerous courts have found in materially similar circumstances, the PSAs' "sole remedy" provisions are unambiguous and enforceable, and mandate dismissal of Plaintiff's damages claims.  *See, e.g.*, *MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*, 843 F. Supp. 2d 996, 1001 (D. Minn. 2012) ("*WMC I*") ("[T]he sole remedy available to [the trustee] is to seek cure, repurchase or substitution of the allegedly defective … mortgages.  [The trustee] may not recover additional remedies, including monetary damages…");  *Home Equity Mortgage Trust Series 2006-5 v. DLJ Mortg. Capital, Inc.*, Index No. 653787/2012, slip op. at 12-13 (N.Y. Sup. Ct., N.Y. Cty. Sept. 18, 2013) ("*HEMT*") (Ex. 28) ("the repurchase protocol is the sole remedy for any [RW] breaches[.]  There is no language in the PSA indicating that consequential damages were within the contemplation of the parties").  *AMBAC Assur. Corp. v. EMC Mortg. LLC*, 2013 WL 2919062, at *3-4 (Sup. Ct. N.Y. Cty. June 13, 2013) (enforcing "sole remedy" provision); *Bear Stearns Mortg. Funding Trust 2007-AR2 v. EMC Mortg. LLC*, 2013 WL 164098, at *3 (Del. Ch. Jan. 15, 2013) ("sole remedy" provisions "specify the extent of the Trustee's remedies"); *Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*, 2012 WL 5192752, at *8 (Sup. Ct. N.Y. Cty. Oct. 11, 2012) (contracts "clearly expressed [ ] that the Repurchase Protocol would be the sole remedy available to the Certificateholders"); *First Bank Richmond, N.A. v. Credit Suisse First Boston Corp.*, 2008 WL 4410367, at *12 (S.D. Ind. Sept. 24, 2008) (dismissing damages claim under PSA because "the remedy for a breach of that section is limited to specific performance"); *Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.*, 2008 WL 1817294, at *8 (M.D. Fla. Apr. 22, 2008) (same).

## B.    DBSP Cannot "Separately Breach" Its "Cure And Repurchase Obligations"

Attempting to circumvent the sole remedy provisions, Plaintiff asserts that the repurchase remedy is actually a contractual promise that can be breached independently of the RWs, and

that such a "failure to repurchase" claim is not subject to the sole remedy.  This is incorrect.[10]

Preliminarily, even if a "failure to repurchase" claim could be brought, it would still be a claim

"respecting" a RW breach, and would therefore still be subject to the sole repurchase remedy,

which applies to all such claims.  *See, e.g.*, *Flanagan v. Prudential-Bache Sec., Inc.*, 67 N.Y.2d,

500 (N.Y. 1986) ("'Respecting' has a broader connotation than 'arising out of'" and includes

claims which "relate to and are concerned with" the topic at issue); *Huffington v. T.C. Grp., LLC*,

637 F.3d 18, 22 (1st Cir. 2011) (same).   More fundamentally, Plaintiff cannot simply

manufacture derivative breach claims, and circumvent the bargained-for limitations on its

remedies, whenever Plaintiff and DBSP disagree as to whether a loan should be repurchased.[11]

Numerous courts have recognized that a repurchase provision in a PSA or MLPA

"merely provides for a remedy in the event of a breach," not independent grounds for suit.

*Walnut Place LLC v Countrywide Home Loans, Inc.*, 96 A.D.3d 684, 684-85 (1st Dep't 2012);

*see also Nomura Asset Acc. Corp. Series 2005-S4 v. Nomura Credit & Capital, Inc.*, 2013 WL

2072817, at *8 (Sup. Ct. N.Y. Cty. May 10, 2013) ("*Nomura*") ("The repurchase obligation in

this case is merely a remedy. It is not a duty independent of the Mortgage Representation breach

of contract claims."); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 2011 WL 5335566, at

*5 (S.D.N.Y. Oct. 31, 2011) (rejecting argument that the "limitations on [plaintiff's] remedies

completely dissolve in the event that, as alleged here, [defendant] fails to 'cure or repurchase' the

defective loans"); *Sterling Fed. Bank, F.S.B. v. Credit Suisse First Boston Corp.*, 2008 WL

4924926, at *12 (N.D. Ill. Nov. 14, 2008) (dismissing mortgage representation breach claims

---

[10] *See Centennial Ins. Co. v. Gen. Elec. Co.*, 253 N.W.2d 696, 697 (Mich. App. 1977) ("Plaintiff's alternative argument that the one year repair or replacement provision constitutes a separate contract, that was breached separately from the contract of sale, is without merit.  Plaintiff's argument is in essence that by failing to remedy its first breach, the defendant committed a second breach. … The fallacy of this approach is apparent.").

[11] Indeed, Plaintiff's argument—that DBSP is in breach if it does not repurchase on demand, no matter the merits of the underlying claim (*e.g.*, WM2 Compl. ¶ 84; HE4 Compl. ¶ 85; HE5 Compl. ¶ 85)—exemplifies its one-sided, unreasonable construction of the Agreements.

which sought "remedial (money) damages" because "the remedy for a breach … is limited to specific performance").[12]   That is because "New York law … does not recognize pre-suit remedial provisions as constituting separate promises which can serve as the basis for independent causes of action." *DBALT*, 2013 WL 3863861, at *10.[13]   "Rather, under New York law, claims which are subject to pre-suit cure or demand requirements accrue when the underlying breach occurs, not when the demand is subsequently made or refused," demonstrating that the failure to provide an agreed-upon remedy is not actionable as a separate breach of contract.  *DBALT*, 2013 WL 3863861, at *10.[14]   Plaintiff's theory cannot be reconciled with settled New York law and must be rejected.

### C.   Plaintiff's Other Arguments Against The Sole Remedy Provision Fail

Plaintiff asserts that section 12 of the MLPA, which concerns the grant of a lien on the loans in favor of ACE to protect its interest in the loans prior to closing, nullifies the sole remedy

---

[12] *LaSalle Bank, N.A. v. Lehman Bros. Holdings, Inc.*, 237 F. Supp. 2d 618, 638 (D. Md. 2002), which asserts that "under New York law, a loan seller's failure to repurchase non-conforming loans upon demand as required by a contract is an independent breach of the contract entitling the plaintiff to pursue general contract remedies for breach of contract," is unpersuasive and should not be followed.  *LaSalle* relied solely and without analysis on *Resolution Trust Corp. v. Key Fin. Servs., Inc.* ("*RTC*"), which affirmed a lower court ruling **without** relying on an "independent breach" theory, 280 F.3d 12, 18 (1st Cir. 2002), and, as several courts have recently found, in no way supports the illogical premise that the failure to remedy a breach is a breach itself.  *See Nomura*, 2013 WL 2072817, at *8 ("[T]he federal district court cases relied on by Plaintiff … misapply [*RTC*] and are unpersuasive.  [*RTC*] … does not hold that a failure to repurchase on demand constitutes an independent breach of contract."); *see also DBALT*, 2013 WL 3863861, at *9 (adopting *Nomura*'s reasoning and rejecting Plaintiff's argument).

[13] In *ACE Securities*, the court held that "the *only* contractual wrong that DBSP could commit" was failure to repurchase, and that breaches of the RWs were not breaches of contract.  965 N.Y.S.2d at 849.  DBSP respectfully disagrees with that ruling, which is on appeal, because, among other things, it squarely conflicts with New York law discussed above that sole remedy provisions are enforceable **limitations** on liability not separate contractual promises that can **expand** liability and, in any event, cannot be squared with the language of the relevant agreements which expressly provide that RW breaches *are* contractual breaches.  PSA § 2.03.  Further, *ACE Securities* does not support Plaintiff's position here that a single RW breach gives rise to *multiple* claims, and also found that (1) "any recovery … must be limited to the formula set forth in the PSA" and (2) "the parties may not disregard [the Repurchase Protocol] in an attempt to seek complete rescission of the PSA."  *Id.* at 851.

[14] *See Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 18 N.Y.3d 765, 770-71 (N.Y. 2012) ("the cause of action accrues when the party making the claim possesses a legal right to demand payment, … not when it actually made the demand."); *Cont'l Cas. Co. v. Stronghold Ins. Co., Ltd.*, 77 F.3d 16, 21 (2d Cir. 1996) ("where a right exists, but a demand is necessary to entitle a person to maintain an action," claim accrues regardless of whether demand has been made); *Nomura*, 2013 WL 2072817, at *8 (accrual not deferred until "the plaintiff chooses to seek a remedy").

provisions because it states that "all rights and remedies of the Purchaser under [the MLPA] are distinct from, and cumulative with, any other rights or remedies under [the MLPA] or afforded by law or equity."  WM2 Compl. ¶ 98; HE4 Compl. ¶ 99; HE5 Compl. ¶ 99.  This is incorrect. *See DBALT*, 2013 WL 3863861, at *9 (rejecting this argument).  MLPA § 12 merely affirms that the remedy created by that section (the grant of a lien), which is ***not*** specified as a sole remedy, does not limit ACE's remedies if the loans are not conveyed to it at closing.  Plaintiff's construction, under which the parties specifically agreed to a sole remedy in both the MLPA and PSA, but simultaneously nullified it through general language buried in a narrowly-applicable provision found only in the MLPA, is patently unreasonable.  *See, e.g.*, *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002) (It is a "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other.").[15]

Finally, in its other actions against DBSP, Plaintiff has argued against enforcing sole remedy provisions (1) by analogy to Section 2-719(2) of the Uniform Commercial Code, which permits other measures of damages "[w]here circumstances cause [an exclusive] remedy to fail of its essential purpose," and (2) by arguing that DBSP's "willful breaches" prohibits its enforcement as a matter of public policy.  Both arguments are meritless.  Plaintiff's "failure of essential purpose" argument fails because UCC § 2-719(2) is inapplicable to sales of mortgages[16] and is in derogation of common law, and as such cannot be applied here.[17]  The UCC analogy

---

[15] If MLPA § 12, which does not concern RW breaches, did conflict with the Repurchase Protocol, the Repurchase Protocol would prevail, since "where there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls."  *Andersen v. Andersen*, 69 A.D.3d 773, 774 (2d Dep't 2010); *see also DBALT*, 2013 WL 3863861, at *9 & n.7.

[16] *See, e.g.*, *Amsterdam Sav. Bank v. Marine Midland Bank*, 121 A.D.2d 815, 818 (3d Dep't 1986).

[17] *See* Eddy, *On the 'Essential Purposes' of Limited Remedies: The Metaphysics of UCC Section 2-719(2)*, 65 CAL. L. REV. 28, 30 (1977) ("[UCC] section[ ] 2-719(2) … break[s] new ground" and does not "restate accepted common law doctrine"); N.Y. STAT. L. § 301 ("statutes in derogation of the common law receive a strict construction").

also fails on its own terms because Plaintiff is entitled to repurchase (a "refund") and this doctrine applies only where a seller "*prohibits refunds* and limits the purchaser's remedies to repair or replacement." *Milligan v. Shuly's Wigs, Inc.*, 2011 WL 6440904, at *1 (N.Y. App. Term Dec. 19, 2011). Second, Plaintiff's "willful breach" argument is contrary to New York Court of Appeals precedent holding that "an allegation that a breach of contract was willful rather than involuntary does not allow a court to disregard an unambiguous limitation of liability provision agreed to by parties of equal bargaining power." *DynCorp*, 215 F. Supp. 2d at 318 (citing *Met. Life*, 84 N.Y.2d at 435). The same result must obtain here.

### D.   Plaintiff Is Not Entitled To Rescissory Damages

As set forth above, Plaintiff's sole remedy is repurchase at the Purchase Price. Under New York law, rescissory damages are unavailable where, as here, "Plaintiff voluntarily gave up the right to seek rescission." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 105 A.D.3d 412, 413 (1st Dep't 2013) ("*MBIA*"). Plaintiff's claims are "contract-based cause[s] of action, and thus, any damages or remedies … will be governed by the parties' written agreements." *MBIA Ins. Co. v. Residential Funding Co., LLC*, 2009 WL 5178337, at *7 (Sup. Ct. N.Y. Cty. Dec. 22, 2009) ("*RFC*"). "[E]xplicit language" specifying a "sole remedy" is a "complete bar to equitable relief,"[18] *Rubinstein*, 23 N.Y.2d at 298, and Plaintiff "cannot be permitted to circumvent the express provisions of the [agreements] through the assertion of quasi-contractual and equitable remedies that go beyond the negotiated terms of those agreements." *RFC*, 2009 WL 5178337, at *7; *see also Abele Tractor & Equip. Co., Inc. v. Varity Corp.*, 977 F. Supp.

---

[18] Damages in lieu of rescission may only be awarded if "the plaintiff succeeds in proving that he is entitled to equitable relief" and "the granting of equitable relief appears to be impossible or impracticable." *Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439, 443 (N.Y. 1956). Therefore, if Plaintiff is precluded from bringing a claim for rescission, a form of equitable relief, it is *a fortiori* precluded from obtaining rescissory damages. *See MBIA*, 105 A.D.3d at 413 (plaintiff cannot obtain rescissory damages where "plaintiff does not actually seek rescission" and where "rescission is not impracticable in any relevant sense" but rather "legally unavailable").

1252, 1254 (N.D.N.Y. 1997) ("Since the Agreement expressly limits recovery …, rescission of the contract would permit recovery above that for which the contract provides.  Thus, [Plaintiff] contractually waived the right to the remedy of rescission..."); *EMI Realty Corp. v. 241-247 Hempstead Tpk., Inc.*, 26 A.D.3d 406, 406 (2d Dep't 2006) (enforcing waiver of right to rescind).  Plaintiff agreed to a "sole remedy" and cannot now obtain the extraordinary equitable remedy of rescissory damages.  *See MBIA*, 105 A.D.3d at 413 ("Plaintiff should not be permitted to utilize this very rarely used equitable tool to reclaim a right it voluntarily contracted away.").[19]

Plaintiff baldly asserts that the "repurchase remedy … was never designed to resolve disputes over more than a handful of loans" and that since the Complaints allege breaches on hundreds of loans, Plaintiff is not limited to the "impractical" repurchase remedy and can recover rescissory damages (WM2 Compl. ¶ 15; HE4 Compl. ¶ 16; HE5 Compl. ¶ 16), but there is simply no basis for Plaintiff's post-hoc speculation that the risk of numerous RW breaches was not contemplated by the parties and allocated via the sole repurchase remedy.  "If the parties had intended to set a materiality threshold beyond which the repurchase remedy was no longer applicable, or to have otherwise provided for transaction-level remedies, they could and should have done so."  *DBALT*, 2013 WL 3863861, at *15 n.14 (rejecting Plaintiff's argument); *see also Assured Guar. Corp. v. EMC Mortg., LLC*, 39 Misc.3d 1207(A), at *4 (Sup. Ct. N.Y. Cty. Apr. 4, 2013) ("*Assured v. EMC*") (rejecting argument that "the Repurchase Protocol was not intended to address pervasive breaches"); *MBIA*, 105 A.D.3d at 413 (The parties "certainly could

---

[19] To the extent that this claim relies on allegations that DBSP "discovered" the RW breaches and still transferred breaching loans to the Trusts, it appears to be based on a theory of fraudulent inducement.  As such, "[t]he rescission claim is based on fraud and therefore must comply with the requirements of Fed. R. Civ. P. 9(b)."  *Banus v. Citigroup Global Markets, Inc.*, 2010 WL 1643780, at *11 (S.D.N.Y. Apr. 23, 2010); *see also Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004) ("Rule 9(b) … is not limited to allegations styled or denominated as fraud.").  As discussed above, the Complaints' vague, conclusory allegations, including their "discovery" allegations pleaded on information and belief, fail to satisfy Rule 8, much less Rule 9(b).  *See, e.g.*, *Watson v. Riptide Worldwide, Inc.*, 2013 WL 417372, at *4 (S.D.N.Y. Feb. 4, 2013) ("In general, allegations of fraud based on information and belief do not satisfy the requirements of Rule 9(b)," and even the exception for pleading "matters particularly within the knowledge of the opposing party" requires "a statement of the facts on which the belief is founded.").

have included such language in the contract.  They did not do so, and this Court will not do so under the guise of interpreting the writing.").[20]

Even if Plaintiff had not contracted away its right to seek rescission, its claim would fail because rescissory relief is available "only when there is lacking complete and adequate remedy at law."  *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (N.Y. 1972).  "Plaintiff in this case has pled the 'adequate remedy at law' of DBSP's contractual obligation to repurchase the affected loans at the Purchase Price."  *DBALT*, 2013 WL 3863861, at *15.[21]

While the *DBALT* court ultimately denied DBSP's motion to dismiss this claim, it did so despite holding, as DBSP argued, that the Repurchase Protocol was Plaintiff's sole remedy, was an adequate remedy at law, and did not cease to apply when Plaintiff alleged more than a "handful" of breaches.  2013 WL 3863861, at *15.  It found that DBSP's motion was "premature" because (1) "rescissory damages are pled in the alternative to Plaintiff's breach of contract claims," and (2) the availability of equitable remedies turned on questions of fact.  *Id.* This was error.  First, irrespective of whether the rescissory damages claim was "pled in the alternative," the *DBALT* court never explained why this mattered (it does not), particularly since the court had just stated that the claim "is, as Defendant asserts, a contract-based cause of action, and any damages or remedies are thus governed by the parties' written agreements."  *Id.* Second, the *DBALT* court agreed with DBSP that the sole remedy provision constituted a waiver

---

[20] In *U.S. Bank, N.A. v. Greenpoint Mortg. Funding, Inc.*, for instance, the contract provided for loan-by-loan repurchase, but lacked a sole remedy provision and also authorized "repurchase … of the entire loan pool" in certain circumstances.  2010 WL 841367, at *7 (Sup. Ct. N.Y. Cty. Mar. 3, 2010).  Instead, the parties here expressly allocated the risk of RW breaches through the sole repurchase remedy, and while Plaintiff may "regret [its] assumption of the[se] risks," this Court must "let [it] lie on the bed [it] made," *Met. Life*, 84 N.Y.2d at 436, rather than allowing it pursue other remedies.  *See Assured v. EMC*, 39 Misc.3d 1207(A), at *5 ("This Court cannot ignore the language of the parties' agreements that plainly restricts Assured to the remedy of the Repurchase Protocol...").

[21] *See also New Shows, S.A. de C.V. v. Don King Prods., Inc.*, 210 F.3d 355 (Table), 2000 WL 354214, at *2 (2d Cir. Apr. 6, 2000) ("[W]hat [plaintiff] seeks through rescission is … payment for the net losses it suffered. … But since the legal remedy in this case is adequate, the equitable remedy of rescission is simply inappropriate."); *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 330 (S.D.N.Y. 2000) (dismissing rescission claim because "Plaintiff has asserted no reason why damages would not be an adequate remedy").

of rescission remedies, and such waiver is grounds for dismissal as a matter of law without the need for discovery. *See, e.g.*, *HEMT*, slip op. at 13 (dismissing rescissory damages claims because of sole remedy provision and concluding that "[n]o further analysis or discovery of facts will allow the plaintiff to recover the sought damages") *Fleet Bank v. Petri Mech. Co., Inc.*, 244 A.D.2d 523, 524 (2d Dep't 1997) (claimants "clearly and unequivocally waived their right," so claim "should have been dismissed as a matter of law"). Third, the *DBALT* court misconstrued *MBIA* as merely holding that "the lower court erred in granting summary judgment on the issue of rescissory damages." 2013 WL 3863861, at *15 n.16. *MBIA* in fact reversed a grant of summary judgment for the plaintiff and dismissed the claim as a matter of law because the right to bring it had been contractually waived; the court in no way held that issues of fact precluded resolution as a matter of law. *See, e.g.*, *Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Capital Holdings LLC*, Index No. 652763/2012, slip op. at 16 (N.Y. Sup. Ct., N.Y. Cty. Aug. 21, 2013) (Ex. 27) ("Under [*MBIA*], neither rescission nor rescissory damages are available to Plaintiffs pursuant to the MLPA's sole remedy clause."); *HEMT*, slip op. at 12-13 (same). The same result as in *MBIA*, *Morgan Stanley* and *HEMT* should obtain here.

## II.  PLAINTIFF'S "DISCOVERY" ALLEGATIONS FAIL

Plaintiff alleges "[o]n information and belief" that DBSP "discovered the breaches subsequently revealed by the Reviews" on the relevant closing dates of the Trusts as a result of "due diligence efforts" in connection with the Trusts (*e.g.*, WM2 Compl. ¶ 81), and through its "affiliation with" db home lending llc and/or MortgageIT, Inc., originators of a subset of loans in the HE4 and HE5 Trusts (HE4 Compl. ¶ 82; HE5 Compl. ¶ 82).[22] Plaintiff pleads no facts in support of these allegations, instead simply concluding that "[g]iven the number, extent, and

---

[22] This latter claim is, of course, facially inapplicable to the remainder of the loans in each Trust originated by other, non-affiliated lenders.

nature of the breaches uncovered by the Forensic Review, it is not commercially plausible" that DBSP did not discover the breaches, "or many of them," and asserting on that basis that DBSP was obligated, under MLPA § 7(a), to repurchase the unspecified loans it purportedly discovered as of the relevant closing dates, without prior notice.  WM2 Compl. ¶ 65; HE4 Compl. ¶¶ 66, 105; HE5 Compl. ¶¶ 66, 105.  This theory, and its implications, are untenable.

MLPA § 7(a), which applies prior to closing, provides that DBSP is obligated to repurchase upon either notice or its own discovery.  PSA § 2.03(a) contains no such "discovery" obligation, and expressly requires the Trustee to provide notice to DBSP.  Under Plaintiff's theory, MLPA § 7(a) nullifies its notice obligation under PSA § 2.03(a)—Plaintiff need not provide DBSP pre-suit notice of breach, because it can always nonspecifically allege on information and belief that DBSP discovered any breaches before closing.  This is contrary to the rule that related contracts should be interpreted so as to harmonize their provisions (*see, e.g.*, *Gulf Ins. Co. v. Transatl. Reins. Co.*, 69 A.D.3d 71, 81 (1st Dep't 2009)), and is clearly inconsistent with the loan-by-loan nature of the Repurchase Protocol.  Indeed, the cases Plaintiff has previously cited to support this argument each concern a single allegedly breaching loan where the complaints aver specific facts suggesting that the defendant clearly knew of the purported RW breach.[23]  These cases in no way support Plaintiff's sweeping argument that it can avoid its notice obligation merely by generically claiming that DBSP discovered unspecified breaches on thousands of unspecified loans simply because it performed the routine diligence typical of RMBS sponsors in the industry.

Plaintiff is also incorrect that its allegations concerning "the number, extent, and nature

---

[23] *See Trust for Cert. Holders of MLMI Series 1999-C1 v. Love Funding Corp.*, 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005) (defendant had "admitted that it was 'generally aware' of [the] fraud through its participation in … lawsuits regarding the [loan at issue]"); *see also LaSalle Bank N.A. v. Citicorp Real Estate, Inc.*, 2003 WL 21671812, at *1 (S.D.N.Y. July 16, 2003) ("a mortgage on a hotel"); *Lehman Bros. Holdings, Inc. v. Laureate Realty Servs., Inc.*, 2007 WL 2904591, at *1 (S.D. Ind. Sept. 28, 2007) ("a loan … secured by a shopping center").

of the breaches uncovered by the Forensic Review" render its discovery allegations plausible. First, the Complaints only specifically mention out of a combined 10,610 loans *twelve* allegedly breaching loans (or 0.11%). WM2 Compl. ¶ 61; HE4 Compl. ¶ 62; HE5 Compl. ¶ 62. Second, the allegation that numerous other loans materially breach RWs is a quintessential legal conclusion not entitled to the presumption of truth, and the fact that this "conclusory assertion comes not from [Plaintiff]" but from Amherst's unnamed consultant "make[s] it no less conclusory." *Tsereteli v. RAST 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010).

Nor does the nonspecific allegation that DBSP is affiliated with MortgageIT, Inc. and db home lending llc, which originated a subset of the loans backing the HE4 Trust (db home lending llc) and HE5 Trust (db home lending llc and MortgageIT, Inc.) add any support or plausibility to Plaintiff's "discovery" allegations. Indeed, the Complaints allege that db home lending llc and MortgageIT, Inc. were the victims of widespread ***borrower*** "misrepresentations and material omissions" made in loan applications and supporting documentation, as evidenced in the Complaints' handful of examples. *See* HE4 Compl. ¶¶ 52, 59, 62; HE5 Compl. ¶¶ 52, 59, 62. Tellingly, the Complaints do not allege (nor could they) that db home lendings llc, or MortgageIT, Inc. in fact discovered those borrower misrepresentations or omission, let alone communicated them to DBSP. Plaintiff's untenable position—that merely pleading the affiliation between DBSP and certain originators nullifies the Trustee's specific contractual obligations to provide notice of each breaching loan and instead permits it to state claims on any and every loan in a Trust—would fundamentally rewrite the parties' agreements. DBSP's affiliation with MortgageIT, Inc. and db home lending, llc was fully disclosed; if the sophisticated parties who drafted these contracts had viewed this affiliation as grounds for dispensing with the Trustee's notice obligations, they would have done so.

19

Therefore, Plaintiff's unadorned speculation that DBSP discovered that unspecified loans breached unspecified RWs, whether through its due diligence or affiliation with certain originators does not give rise to "more than a sheer possibility" that such discovery actually occurred with respect to any loan. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also In re Merrill Lynch Auction Rate Sec. Litig.*, 886 F. Supp. 2d 340, 344 (S.D.N.Y. 2012) ("Plaintiff's allegations would require the Court to pile inference upon inference and they therefore 'stop[ ] short of the line between possibility and plausibility of entitlement to relief.'"); *Goodman v. Port Auth. of N.Y. & N.J.*, 2011 WL 3423800, at *9 (S.D.N.Y. Aug. 4, 2011) ("Speculation … 'upon information and belief'" that defendant had "'prior and specific notice' is insufficient to survive a dismissal motion."); *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 44 (1st Cir. 2012) ("'Information and belief' does not mean pure speculation.").

The *DBALT* court erred in crediting Plaintiff's discovery allegations, and this error led that court to deny DBSP's motion to dismiss Plaintiff's damages claims, despite agreeing with DBSP that repurchase was Plaintiff's sole remedy and rejecting Plaintiff's "independent breach" theory.  First, the *DBALT* court simply accepted Plaintiff's characterization of its Complaint as containing "detailed factual allegations regarding the apparent breaches in the loans and DBSP's due diligence process."  2013 WL 3863861, at *5.  Second, that court incorrectly afforded Plaintiff's conclusory breach allegations the presumption of truth.  *Id.*  It therefore found that dismissal of Plaintiff's damages claim was "premature" because if these "discovery" allegations were proved true with respect to any loan, "an award of money damages" (at the "Purchase Price") for that loan would not "deprive [DBSP] of its side of the contractual repurchase bargain where, through [DBSP's] own fault, the 90-day cure period has long since expired." *Id.* at *11.

This error also led the *DBALT* court to rule that Plaintiff could take discovery to

determine whether DBSP had discovered breaches in further loans, not identified in any breach notices. *DBALT*, 2013 WL 3863861, at *8. This ruling is clearly inconsistent with the loan-by-loan nature of the Repurchase Protocol. As the Delaware Chancery Court has held, the argument that a plaintiff can sue on any loan simply because it has alleged breaches of other loans and "expects [that] further claims of a similar nature may be discovered in the future" is an improper "end run [around] this clear contractual loan-by-loan requirement." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 2012 WL 3201139, at *3 (Del. Ch. Aug. 7, 2012). The repurchase remedy is a loan-by-loan remedy. Thus, to authorize a plaintiff to take discovery to determine whether it has claims on other unspecified loans is to countenance an improper fishing expedition. *See Stoner v. Walsh*, 772 F. Supp. 790, 800 (S.D.N.Y. 1991) ("The purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists."); *see also Chechele v. Morgan Stanley*, 2012 WL 4490730, at *6-7 (S.D.N.Y. Sept. 26, 2012) (claim that other violations might exist and would be identified through discovery "presents mere speculation and fails the most basic pleading requirements of Rule 8 of the Federal Rules of Civil Procedure"); *Cent. Mortg.*, 2012 WL 3201139, at *19 (Repurchase provisions "cannot in any way be read as meaning that the notice of the breach of one loan is notice as to breach of all other [ ] loans. If accepted, [plaintiff's contrary] argument would disrespect not only the contracts it signed but also work injury to the efficiency of commercial law in general.").

## III.    PLAINTIFF'S SPECIFIC PERFORMANCE CLAIMS MUST BE DISMISSED

Plaintiff's failure to comply with the Repurchase Protocol before suit renders specific performance unavailable. The specific performance claims must also be dismissed because they indiscriminately assert claims concerning loans no longer owned by the Trusts, which are not subject to repurchase under the terms of the PSAs.

A.        **The Breach Notices Sent To DBSP Were Inadequate**

As discussed above, Plaintiff's inadequate discovery allegations do not relieve it of the obligation to provide DBSP with prompt notice that specific loans breach specific RWs, and then to afford DBSP 60 days to cure or 90 days to repurchase such loans before bringing suit. PSA § 2.03(a).   The Trustee has not complied with these requirements, so its specific performance claims should be dismissed.  *See WMC I*, 843 F. Supp. 2d at 1000 (Claims "for which [plaintiff] has yet to give [defendant] notice and an opportunity to cure … must be dismissed.").

First, the Trustee cannot meet its obligations by forwarding, without review, unsubstantiated allegations concerning thousands of loans and without adequate supporting documentation.  DBSP, having transferred the loans to the Trusts years ago, does not itself possess relevant documentation, and must attempt to collect it from third parties in order to ascertain the merits of the breach claims.  No reasonable construction of the Agreements requires DBSP to repurchase loans sight unseen without regard to the merits of the claims asserted merely because the Trustee forwards it *disavowed allegations* from litigious investors; for DBSP to be required to repurchase a loan, such loan must both *actually* breach a RW, and the breach must *materially and adversely* affect the value of the loan.  *See* PSA § 2.03(a).  Notices which, as here, make review and analysis of breach claims within 90 days of receipt impossible as a practical matter cannot be effective notices under the PSA.[24]  *See Atl. Richfield Co. v. Interstate Oil Transp. Co.*, 784 F.2d 106, 113 (2d Cir. 1986) (notice must be "sufficient to give" recipient

---

[24] MLPA § 7(a), providing that the RWs "shall not be impaired by … any failure on the part of [DBSP] or [ACE] to review or examine" the loan files prior to closing, does not alter this conclusion.  That provision exists simply to make clear that as assignee of ACE's rights under the MLPA, the Trustee is not charged with its predecessor's knowledge as to the RWs, which could conceivably render the RWs unenforceable.  *See CBS Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d 496, 503-04 (1990).  Further, Plaintiff is simply incorrect that because the PSAs do not require it to investigate any "facts or matters" stated in any certificateholder notice (PSA § 9.02(v)) it is exonerated from meeting its express duty under PSA § 2.03(a) of providing DBSP with notice of ***actual*** RW breaches or allows it to obtain repurchase by forwarding unsubstantiated breach allegations from third-parties while disclaiming their merit.

"meaningful opportunity" to perform).  It is even less appropriate for the Trustee, as here, to pass through these deficient notices and then accuse DBSP of "willful" misconduct and "repudiation" where the Trustee did not stand behind these claims before it sued, and then sued before the applicable pre-suit notice and cure periods even expired with regard to some of the loans.[25]

Moreover, as discussed below, Plaintiff purports to assert claims without regard to whether the underlying loans remain Trust assets capable of repurchase.  Providing notice of and demanding repurchase long after the loan at issue has ceased to exist cannot constitute "prompt notice" under any reasonable measure.  As the court stated in *MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*, 2012 WL 4511065, at *7 (D. Minn. Oct. 1, 2012) ("*WMC II*"):

> [T]he undisputed purpose of the "prompt notice" requirement is to allow [defendant] the opportunity to attempt to cure the breach within the 60–day cure period or, if it cannot cure, to take whatever meaningful action it chooses to take in order to protect its interest in the repurchased loan. But here, notice of the breach came **after** each loan was liquidated. Providing [defendant] notice of the R & W breach only after the Trust elected to foreclose eviscerates [defendant's] mitigation opportunities.  In light of the purpose of the repurchase remedy, the Court fails to see how notice following foreclosure can be "prompt."

### B.  Plaintiff Fails To Plead Claims Concerning Loans Subject To Repurchase

Section 2.03(a) of each PSA provides that in the event DBSP does not cure a material and adverse breach it must "repurchase such Mortgage Loan from REMIC I," the primary trust fund

---

[25] DBSP does not "repudiate" the Agreements by conducting an independent review of breach claims prior to repurchase, or (as discussed below) by declining to "repurchase" liquidated loans.  Repudiation is "[a] statement by a party to the other that he will not or cannot perform without a breach, or a voluntary affirmative act that renders him unable or apparently unable to perform without a breach," REST. 2D CONTRACTS § 250 cmt. a, and the Complaints allege nothing of the sort.  They simply allege that DBSP has refused to **remedy** RW breaches by repurchasing all loans, sight unseen, mentioned in the pre-suit breach letters, not that it failed to perform any contractual obligation.  At best, the parties dispute the proper interpretation of the Agreements, which under New York law does not amount to a repudiation.  *See Meltzer v. G.B.G., Inc.*, 176 A.D.2d 687, 688-89 (1st Dep't 1991) (disagreement as to contract interpretation is not repudiation unless the interpretation is "untenable" or proffered in "bad faith"); *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*, 869 F.2d 1518, 1523 (D.C. Cir. 1989) (no repudiation unless interpretation is "so inherently unreasonable as to amount to bad faith"); *cf. Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionery Workers Int'l, AFL-CIO*, 370 U.S. 254, 263 n.10 (1962)) ("[M]ere nonperformance, even though unjustified, is not per se a 'repudiation.'").  DBSP's contract interpretation, as discussed herein, is far from unreasonable and has been accepted by numerous courts.  Plaintiff's claims concerning the loans identified in the unexpired March 12 letter are therefore independently subject to dismissal.

created by the PSA.  "Mortgage Loan" is defined as "[e]ach mortgage loan … held from time to time as a part of the Trust Fund" and identified as such on the "Mortgage Loan Schedule."  PSA § 1.01 ("Mortgage Loan").  As these provisions demonstrate, only a "Mortgage Loan" which is an asset of the relevant Trust at the time repurchase is demanded can be subject to repurchase. Loans that have been removed from REMIC I for whatever reason, including liquidation after default, are therefore no longer subject to repurchase under Section 2.03(a).[26]  In the years that elapsed before DBSP received any repurchase demands, many loans that were initially assets of the Trusts were removed from the Trusts.[27]   The Complaint, however, brings claims indiscriminately without regard to whether any of the loans at issue are capable of repurchase, and therefore fails to articulate the elements of its specific performance claim.  *See First Place Bank v. Skyline Funding, Inc.*, 2011 WL 824612, at *2 (N.D. Ill. Mar. 4, 2011) ("*First Place I*") (dismissing complaint that failed to "allege that plaintiff owned the loans when it demanded [defendant] repurchase them" because "[w]ithout alleging that plaintiff had the loans when it made its demand to [defendant], the complaint does not allow the court to conclude that [defendant] could have repurchased the loans.").  These claims should therefore be dismissed.

Several courts have recognized that a repurchase remedy only applies to loans that the defendant can actually repurchase from the plaintiff.  *See Nationwide Advantage Mortg. Co. v. Mortg. Servs. III, LLC*, 2013 WL 1787551, at *2 (N.D. Ill. Apr. 25, 2013) ("[Defendant] cannot

---

[26] The PSAs provide specific procedures for such liquidations.  *See, e.g.*, PSA §§ 3.13, 4.12 ("Realization Upon Defaulted Mortgage Loans") (the Servicer must "foreclose upon, repossess or otherwise comparably convert the ownership of Mortgaged Properties securing such of the Mortgage Loans as come into and continue in default").

[27] For purposes of this motion, the Court need not decide which of Plaintiff's breach allegations pertain to Mortgage Loans that are still assets of the Trusts.  Nonetheless, to illustrate the significance of this issue, it is worth noting that recent remittance reports issued by the Securities Administrator for each Trust indicates that a majority of the loans are no longer Trust assets.  *See* Ex. 24 (WM2 Trust Remittance Report dated May 25, 2013) at 7 (listing 1,369 loans remaining in the trust out of an original pool of 4,048)); Ex. 25 (HE4 Trust Remittance Report dated April 25, 2013) at 7 (listing 904 loans remaining in the trust out of an original pool of 4,727); Ex. 26 (HE5 Trust Remittance Report dated May 28, 2013) at 7 (listing 536 loans remaining in the trust out of an original pool of 1.835).

repurchase either the Mortgage Loan or the property because [plaintiff] owns neither. [Plaintiff's] attempt to alter or broaden the term 'repurchase' is unpersuasive."); *Franklin Am. Mortg. Corp. v. First Educators Credit Union*, 2013 WL 1785498, at *1-2 (M.D. Tenn. Apr. 25, 2013) (rejecting repurchase claim where plaintiff "did not own the loans" because "Defendant could not repurchase th[os]e loans from Plaintiff"); *WMC II*, 2012 WL 4511065, at *5 (requiring "repurchase following foreclosure and sale of the collateral … would be contrary to both the apparent intent of the parties and common sense"); *First Place Bank v. Skyline Funding, Inc.*, 2011 WL 3273071, at *4 (N.D. Ill. July 27, 2011) ("*First Place II*") (defendant could not have "repurchase[d] loans that plaintiff did not own when it demanded that [defendant] repurchase them") (Illinois law); *Lehman Bros. Holdings, Inc. v. Key Fin. Corp.*, 2011 WL 1296731, at *11 ("It is not clear to the Court how a loan that has been liquidated could be repurchased.").

First, "'repurchase' is 'the act or an instance of buying something back or again.'" *Nationwide*, 2013 WL 1787551, at *2. The term does not "incorporate within its meaning an obligation to 'reimburse'" as an alternative remedy. *Id.* The PSAs also clearly contemplate actual "repurchases," such that reading in a "reimbursement" obligation would "sit uneasily with other provisions." *WMC II*, 2012 WL 4511065, at *5. For instance, upon repurchase, the Trustee must "release to [DBSP] the related Mortgage File and … execute and deliver such instruments of transfer or assignment" so as to "vest" title to the loan in DBSP. PSA § 2.03(a).

Second, DBSP is only required to repurchase "Mortgage Loans," and once its lien is released in a liquidation, a loan is no longer a "Mortgage Loan," since a "mortgage loan" held by a REMIC must be an "obligation … which is principally secured by an interest in real property." 26 U.S.C. § 860G(a)(3)(A).[28] Thus, even if the Trusts held post-liquidation remnants of loans,

---

[28] That a "mortgage loan" is a "loan secured by a mortgage or deed of trust on real property" is also true as a matter of black-letter property law. *E.g.*, Black's Law Dictionary (9th ed. 2009) ("Mortgage loan").

those assets would not constitute "Mortgage Loans" subject to repurchase. *See WMC II*, 2012 WL 4511065, at *4 (post-foreclosure remnants are not "Mortgage Loans," as "[i]t would be a tortured reading … to equate [a] loan's constituent parts with the loan itself"); *First Place II*, 2011 WL 3273071, at *4 (requiring "repurchase" after foreclosure would be "nonsensical").[29]

Third, the "Purchase Price" specified by each PSA confirms that the parties did not intend for liquidated loans to be subject to repurchase. The "Purchase Price" consists of "100% of the Stated Principal Balance thereof as of the date of purchase," along with accrued interest and, where applicable, unreimbursed servicing fees and certain limited expenses incurred by the Trustee. PSA § 1.01 ("Purchase Price"). A Mortgage Loan has a Stated Principal Balance of "***zero***" ($0) once "the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan" have been distributed, and a "Liquidation Event" occurs when the Servicer determines that all recoverable proceeds with respect to the loan have been recovered, through foreclosure or otherwise. *Id.* ("Stated Principal Balance"; "Liquidation Event"). The fact that the repurchase price would be $0 even if liquidated loans were subject to repurchase "further shows that the parties did not contemplate the repurchase remedy as being applicable in the present circumstance." *WMC II*, 2012 WL 4511065, at *6 n.9.[30]

---

[29] *Trust For Certificate Holders of MLMI 1999-C1 v. Love Funding Corp.* found that repurchase of a foreclosed loan was not "barred by the doctrine of impossibility" because the relevant definition of "Mortgage Loan" "'includes without limitation … Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, and all other rights, benefits, proceeds, and obligations arising from or in connection with such Mortgage Loan," "several [of which] components … continue[d] to exist." 2005 WL 2582177, at *8 (S.D.N.Y. Oct. 11, 2005). This decision is inapplicable. First, the PSA's definition of "Mortgage Loan" includes none of these components. Second, DBSP does not argue that its performance has been rendered impossible by an unforeseen circumstance, but rather that the PSA does not contemplate the performance Plaintiff seeks. *See WMC II*, 2012 WL 4511065, at 6 n.10 (agreement did not contemplate repurchases of liquidated loans, so it was " unnecessary to address" impossibility argument).

[30] *Flagstar I*'s rejection of a superficially similar "zero balance" argument, 2011 WL 5335566, at *7-8, is distinguishable. That decision found that because the contracts contained detailed provisions regarding "the circumstances in which Flagstar must [pay plaintiff], and the process by which it must do so," the payment could not "always necessarily be 'zero.'" *Id.* Here, the contractual Purchase Price is not "always necessarily" zero; it is only zero when demands are made post-liquidation. This does not create any ambiguity or render DBSP's construction absurd; it simply means that in certain circumstances, "the price established by the contract—which by its terms

26

This reflects the parties' contractual allocation of risk.  *See Met. Life*, 84 N.Y.2d at 436 ("Agreement[s] on the allocation of the risk of economic loss" should be "honor[ed].").  Until a repurchase demand is made, Plaintiff bears the risk that the loan will be liquidated; post-demand, that risk shifts to DBSP.  *See RTC*, 280 F.3d at 18 n.14 (defendant bore risk of liquidation "from the moment a proper repurchase demand was made.").  This obligates Plaintiff to timely inform DBSP of alleged breaches, rather than wait for years and indiscriminately assert thousands of breach claims (as happened here), which fully comports with the PSA's requirement that DBSP receive "prompt notice" of breaches and an opportunity to cure.  *See WMC II*, 2012 WL 4511065, at *7 ("[P]roviding notice of an alleged R & W breach only after foreclosing on the property securing the loan cannot constitute 'prompt notice' under any reasonable understanding of that term because such notice functionally deprived [defendant] of a meaningful opportunity to attempt to cure the alleged breaches or mitigate its losses in any way.").

Rather than identifying any language in the Agreements to support its claims, Plaintiff resorts to *ipse dixit* assertions and misplaced policy arguments.  Plaintiff alleges that requiring "repurchase" of nonexistent loans at a "make whole" price rather than the contractually-specified "Purchase Price" is "consistent with DBSP's unequivocal obligations under the PSA and the MLPA" (WM2 Compl. ¶ 86; HE4 Compl. ¶ 87; HE5 Compl. ¶ 87) but provides no textual basis for this statement.  DBSP's obligations under the Agreements "unequivocal[ly]" extend only as far as the Agreements themselves provide, and the only thing "consistent with" the PSA and MLPA is enforcing them according to their terms, including those that limit DBSP's liability.  Plaintiff also baselessly asserts that "[i]t is simply not conceivable that any Certificateholder would have invested in the Trust if it had had any idea" that liquidated loans "would be excluded

---

could have been something other than zero—turn[s] out to be zero, a possibility clearly contemplated by the agreement" *Kreiss v. McCown DeLeeuw & Co.*, 131 F. Supp. 2d 428, 436-37 (S.D.N.Y. 2001).

from DBSP's cure, substitution, or repurchase obligations" (WM2 Compl. ¶ 85; HE4 Compl. ¶ 86; HE5 Compl. ¶ 86), but "the courts may not rewrite the agreement to relieve a sophisticated contracting party from terms that it later deems disadvantageous." *John Doris, Inc. v. Solomon R. Guggenheim Found.*, 209 A.D.2d 380, 380 (2d Dep't 1994).  In any event, the Agreements were publicly available to Amherst and other certificateholders on the SEC's website thus belying the notion that they did not know of or understand the Agreements' unambigous terms.

Finally, Plaintiff nonspecifically alleges that DBSP and other sponsors have paid "make whole" payments on such loans as a matter of "custom and practice," and vaguely asserts that this custom and practice is "well known to industry participants" and is "reflected in" unspecified "data" and "documents."  WM2 Compl. ¶ 86; HE4 Compl. ¶ 87; HE5 Compl. ¶ 87. However, agreements governing bulk purchases of mortgage loans are complex, carefully drafted documents tailored to particular transactions.[31]  Plaintiff's vague allegation that no matter the contract language, loan sellers *always* pay "make whole" payments cannot call the unambiguous language of the Agreements into question.  *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993) ("Extrinsic evidence may not be used to create an ambiguity in an otherwise unambiguous agreement.").

**C.**     **The Contrary Reasoning Of *ACE Securities* and *DBALT* Should Be Rejected**

The *ACE Securities* court found DBSP's argument that liquidated loans were not subject to repurchase "unconvincing" on the basis of improper policy arguments and incorrect factual assumptions.  965 N.Y.S.2d at 850.  This reasoning was then adopted in *DBALT*, 2013 WL 3863861, at *14.   Preliminarily, these courts erred in relieving Plaintiff of its obligation to plead

---

[31] In fact, where parties to mortgage purchase transactions wanted to provide for "make whole" payments, they knew how to do so.  For example, the repurchase provision of the Sale and Servicing Agreement at issue in *Assured Guar. Mun. Corp. v. DB Structured Prods., Inc.*, No. 650705/2010 (Sup. Ct. N.Y. Cty.) provides that "if any [loan] to be repurchased has theretofore been liquidated, [DBSP] shall be obligated to pay any Realized Loss to the Securities Administrator for deposit into the Payment Account."  Ex. 30 at § 2.02.

viable claims and instead ruling that it was DBSP's burden to determine, in discovery, whether particular loans had been liquidated.  However, having so ruled, the courts should have stopped there.  Instead, they further erred by rewriting the plain terms of the PSA to create purportedly better "incentives," and by prematurely resolving perceived ambiguities against DBSP.

These courts' reasoning was driven by the faulty conclusions that under DBSP's interpretation, DBSP "would be perversely incentivized to fill the Trust with junk mortgages that would expeditiously default … before a repurchase claim is made," and that "[i]f, as DBSP contends, the Certificateholders' recovery on misrepresented loans is limited to foreclosure proceeds, the repurchase remedy would be virtually worthless."  *DBALT*, 2013 WL 3863861, at *14 (quoting *ACE Securities*, 965 N.Y.S.2d at 850).  Even if this were accurate, it would not be grounds to reject DBSP's construction, since "[a] court may not, of course, rewrite a contract to accord with its instinct for the dispensation of equity under the facts of a case."  *De Vanzo v. Newark Ins. Co.*, 44 A.D.2d 39, 43 (2d Dep't 1974).  Moreover, the RMBS were publicly offered pursuant to disclosure documents registered with the SEC, and if these disclosures contained material misstatements, they could give rise to securities law claims by investors, which are unaffected by the liquidation of any loans.  Therefore, the fact that the repurchase remedy does not survive post-liquidation would not create any incentive for DBSP to fill the Trusts with "junk."  Nor does the fact that repurchase demands must be made while loans still exist render the remedy "virtually worthless."  It merely means that demands must be made in a timely fashion.  *See Kreiss*, 131 F. Supp. 2d at 436-37 (rejecting argument that plaintiff could not have intended a right to "eventually have no value whatsoever" where contract's "precise … formula for determining the repurchase price" became zero after the passage of time).

As the *DBALT* court recognized, "the PSA does not anywhere include a provision

requiring DBSP to [pay] 'make whole' payments for extinguished loans." 2013 WL 3863861, at *13. Accordingly, the only way for that court (or the *ACE Securities* court) to have concluded that such remedies were available was to determine that the terms of the Agreements should be altered through extrinsic evidence. Reaching this conclusion on a motion to dismiss was, respectfully, inappropriate.[32] If, as these courts concluded, ambiguities in the contracts precluded dismissal, they should have refrained from attempting to discern the parties' intent at the pleading stage with reference to unsubstantiated allegations of extrinsic matters or speculation as to what would create the best "incentives."

## IV. PLAINTIFF'S DECLARATORY JUDGMENT CLAIMS MUST BE DISMISSED

"[D]eclaratory judgment [is] inappropriate where a party has already invoked its right to a coercive remedy," and Plaintiff, of course, brings contract claims in these actions under the same Agreements that underlie its declaratory claims. *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, 2010 WL 1257326, at *11 (S.D.N.Y. Mar. 12, 2010); *see also DBALT*, 2013 WL 3863861, at *16 (dismissing identical claim). These claims also fail because Plaintiff's underlying claims are subject to dismissal, and because DBSP cannot be held liable for "expenses incurred" by Amherst in developing its breach claims (WM2 Compl. ¶ 138; HE4 Compl. ¶ 140; HE5 Compl. ¶ 140), since the Agreements do not provide for this. *See DLJ Mortg. Capital*, 2012 WL 5192752, at *8 ("The clear language of the PSAs excludes … Certificateholders from the sentence in section 2.03 allowing the Trust, the Trustee and the Servicer to recover out-of-pocket expenses. Further, the American rule is that attorneys' fees are not recoverable absent an express agreement, statute or court rule.").

---

[32] *See, e.g., Vectron Int'l, Inc. v. Corning Oak Holding, Inc.*, 106 A.D.3d 1164 (3d Dep't 2013) ("if the contract's language is ambiguous, then the motion must be denied to permit the parties to discover and present extrinsic evidence of the parties' intent"); *Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1378 (E.D.N.Y. 1988) (dispute concerning ambiguous contract "is ripe for final disposition only once "all the evidence offered by the parties is before the court").

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court grant its motion to dismiss the Complaints with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:  September 27, 2013
     New York, New York

        SIMPSON THACHER & BARTLETT LLP

       By:   */s/ David. J. Woll*
          Thomas C. Rice (trice@stblaw.com)
          David J. Woll (dwoll@stblaw.com)
          Isaac M. Rethy (irethy@stblaw.com)
          Evan I. Cohen (ecohen@stblaw.com)

          425 Lexington Avenue
          New York, NY 10017-3954
       Tel:  (212) 455-2000
       Fax:  (212) 455-2502

          *Attorneys for Defendant DB Structured Products, Inc.*

31